NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

TERESA JOHNS o/b/o HOWARD JOHNS
(deceased),

                **Plaintiff,**

-vs-                                     **Case No. 6:10-cv-385-Orl-28KRS**

COMMISSIONER OF SOCIAL SECURITY,

                **Defendant.**
_____

## REPORT and RECOMMENDATION

**To the United States District Judge:**

This cause came on for consideration without oral argument on the Complaint filed

by Howard M. Johns (Johns), seeking review of the final decision of the Commissioner of

Social Security denying his claim for social security benefits.  Doc. No. 1.  Following the

death of Johns on January 29, 2011, his wife, Teresa Johns (Mrs. Johns), was substituted

as plaintiff.  Doc. Nos. 24-25.  The Commissioner answered the Complaint and filed a

certified copy of the record before the Social Security Administration (SSA).  Doc. Nos. 13,

15.

## I.      PROCEDURAL HISTORY.

Johns applied for disability benefits under the Federal Old Age, Survivors and

Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.*, and under the

Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C.

NOT FOR PUBLICATION

§ 1381, *et seq.*, (sometimes referred to herein as the Act).  R. 65-67, 318-320A. He alleged

that he became disabled on September 1, 2001.  *Id.*  Johns' applications were denied

initially and on reconsideration.  R. 26-30, 35-36, 321-25, 327-28.

Johns requested a hearing before an administrative law judge (ALJ).  R. 37.  An ALJ

held a hearing on March 31, 2005.  Johns, represented by an attorney, testified at the

hearing.  Cynthia Patterson, a vocational expert (VE), also testified.  R. 332-85.  The ALJ

denied the request by Johns' counsel to call Mrs. Johns as a witness at the hearing.  R.

381-82.

After considering the testimony and the medical evidence presented, the ALJ found

that Johns had the residual functional capacity (RFC) to perform a reduced range of light

work,[1] as follows:  he is "able to lift and/or carry up to 20 pounds occasionally and 10

pounds or less more frequently.  He can stand for 6 hours in an 8 hour day, sit for at least 2

hours and is capable of pushing and pulling within the weight noted. . . .  [He] must avoid

hazards, including work around dangerous moving machinery, unprotected heights, driving

and climbing.  He is capable of performing simple one to two step job tasks and cannot be

subject to meeting any production quotas."  R. 22.

In reaching this conclusion, the ALJ gave little weight to the functional capacity

assessments prepared by Dr. Corak and Dr. Benezette, both of whom were Johns' treating

physicians.  He found that Dr. Corak's assessment was inconsistent with his progress

---

[1]Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §§ 404.1567, 416.967.

NOT FOR PUBLICATION

notes.  R. 20-21.  He found that Dr. Benezette's opinion was based on materially false and incomplete information that Johns had given him.  R. 20.  The ALJ also found that Johns' testimony about the limitations arising from his impairments was not totally credible, based on conflicting statements he had made during treatment and at the ALJ's hearing, among other things.  R. 19, 22.

Because Johns' past relevant work required more than a light level of exertion, the ALJ concluded that Johns could not return to his past relevant work.  R. 22.  Relying on the testimony of the VE, and considering the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt P, App. 2, the ALJ concluded that Johns could work in light or sedentary unskilled jobs identified by the VE that were available in the national economy. R. 23.  Therefore, the ALJ concluded that Johns was not disabled.  R. 24. The Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 5-7.

Johns appealed that determination to this Court.  On September 25, 2007, the undersigned reversed the decision of the ALJ and remanded the case for further proceedings.  R. 412-434.

The ALJ held another hearing on August 4, 2009. Two medical experts, Bruce G. Whitkind, M.D., and Edward A. Griffin, M.D., testified based on their review of Johns' treatment records.  Johns, his daughter and his wife also testified. Additionally, David Pigue, a VE, testified.  R. 683-774.

The ALJ issued an decision in which he again found that Johns was not disabled. R. 389-409.  The ALJ found that Johns was insured under OASDI through June 30, 2005.  R.

NOT FOR PUBLICATION

391.  Johns had a history of seizures and depression, which were severe impairments that did not meet or equal any impairments listed in the social security regulations.  R. 391-400.  The ALJ concluded that Johns had the following RFC:

> The claimant can sit, stand and walk for at least six hours or more in an eight hour work day.  He can lift up to 20 pounds occasionally and 10 pounds or less more frequently.  He has the ability to push and pull objects of the same weight limitations as well as grasp, pull, finger, turn, handle and manipulate objects of the same weights limits.  He has no deficits in his ability to reach overhead or in any other direction with either upper extremity.  Posturally, the claimant can occasionally climb ramps and stairs and should never climb ladders, ropes or scaffolds.  He can occasionally balance, stoop, kneel, crouch and crawl.  He has environmental limitations which would preclude him from working around unprotected heights, dangerous machinery and from operating a motor vehicle.  He should not work in extreme heat or extreme cold and should not work around concentrated atmospheric pollutants such as dust, smoke, chemicals, gases or fumes.  He is limited to simple one and two step types of work which do not involve any significant judgment.

R. 393.

After a thorough review of all of the evidence, the ALJ found that Johns' testimony was less than credible based upon conflicting testimony given and the reports he made to his doctors.  As such, the ALJ found that it was impossible to determine when Johns was being truthful.  R. 404.  The ALJ further found that Johns did not follow his doctor's recommendations, specifically by not beginning medication when prescribed and by stopping medication when he felt he did not need it.  Based on the testimony of Dr. Griffin and a treatment note of Dr. Corak, the ALJ concluded that Johns' failure to report his seizure activity accurately to his treating physicians led to years of less than aggressive or inappropriate treatment.  *Id.*

NOT FOR PUBLICATION

In reaching this conclusion, the ALJ gave great weight to the opinion of Dr. Griffin. R. 406.  The ALJ also gave some weight to the opinion of the non-examining physicians who rendered functional capacity assessments after reviewing Johns' records.  *Id.*

The ALJ did not give Dr. Corak's opinion controlling or substantial weight because it was not well-supported by medically acceptable clinical and laboratory diagnostic findings and because it was internally inconsistent as noted by Dr. Griffin.  It was also inconsistent with other treating and examining professionals.  R. 405.

The ALJ also rejected the opinion of Dr. Benezette based on Dr. Whitkind's testimony that the records did not provide objective evidence to support the conclusion reached and Dr. Griffin's testimony that the reports lacked specificity.  *Id.*

The ALJ again concluded that Johns could not return to his past relevant work.  R. 407.  In reliance on the testimony of the VE, the ALJ found that there were unskilled jobs requiring a light level of exertion available in the national economy that Johns could perform, specifically assembler of small products, electrical worker and assembler of electrical accessories.  R. 408.  Therefore, the ALJ concluded that Johns was not disabled. R. 409.

## II.      JURISDICTION.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Johns' request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. §§ 404.981, 416.1481.  Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

### III.   STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).  In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

(1)  Is the claimant presently unemployed?

(2)  Is the claimant's impairment severe?

(3)  Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4)  Is the claimant unable to perform his or her former occupation?

(5)  Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id.* at 1278 n. 2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision.  *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment.  *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).  Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law.  *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## IV.  STATEMENT OF FACTS.

The facts developed after remand are generally adequately set forth in the ALJ's decision and the parties' memoranda.  Therefore, I summarize the evidence in the record only to the extent necessary to resolve the issues raised in Johns' memorandum.

Johns was born in 1955.  He obtained a GED degree and additional vocational training in electronics.  R. 336.  He worked as a truck driver, line cook and cable television installer.  R. 337-41.

NOT FOR PUBLICATION

Johns suffered a head injury in a boating accident in 1984.  R. 265.  Thereafter, he began having seizures.

John R. McCormick, M.D., began treating Johns for a seizure disorder in January 1985.  He prescribed Dilantin, and he prohibited Johns from climbing on roofs and working on ladders.  At that time, Johns was not working or driving.  R. 249.  During his next examination by Dr. McCormick, Johns reported that he had a seizure at 1:00 a.m. on February 21, 1985 during which he had dislocated his shoulder.  Dr. McCormick noted that blood tests purported showed a subtherapeutic level of Dilantin, and he increased the doseage of Dilantin.  *Id.*

In May 1985, Johns reported that he had had a seizure six days earlier.  R. 248.  Dr. McCormick again increased the dosage of Dilantin and prescribed Tegretol.  R. 248.  In July, Johns indicated that his arm still would go out of joint at night.  R. 248.

In August 1985, May 1986 and November 1986, Johns did not report any seizure activity.  R. 246-47.  Hendrik Dinkla, M.D., examined Johns in November 1990.  Johns indicated he had not had a seizure since 1985.  His Dilantin and Tegretol levels were within normal limits, and he showed no signs of toxicity.  R. 245.

Johns reported his next seizure on April 29, 1994, during an examination by Dr. McCormick.  R. 241.  However, in his appointment on September 23, 1994, he was seizure free.  R. 240.  Johns advised Dr. Dinkla on December 1, 1985 that he had not had any seizures for the previous year.  R. 238.

NOT FOR PUBLICATION

Jeffrey Corak, M.D., began treating Johns in May 1996.  R. 237.  Johns still reported that he was seizure free.  His Dilantin level was 8.5 and his Tegretol level was 2.5, both below the normal ranges, but Dr. Corak indicated that he was doing well.  *Id.*

After the alleged disability onset date, September 1, 2001, Johns initially reported that he had not been having any seizures.  R. 224, 230-31, 233-34, 236.  In December 2002, however, he told David Thompson, M.D., that he had three to four seizure episodes in the previous six months, with three such episodes in November.  R. 216.  Dr. Thompson's impression was the Johns had a partial complex seizure disorder with secondary generalization that was poorly controlled.  His Dilantin level was 8.4 and his Tegretol level was 1.1, both below normal.[2]  Dr. Thompson recommend that Johns not drive until the seizures were brought under control.  *Id.*  In January 2003, Dr. Corak asked Johns to start keeping a seizure calendar.  R. 215.  In subsequent examinations, Johns reported no seizure activity.  R. 212, 215, 221-22, 225-26.

In April 2003, Murthy Ravipati, M.D., rendered a RFC assessment after reviewing Johns' records.  Dr. Ravipati opined that Johns could lift twenty pounds occasionally and ten pounds frequently.  He could sit, stand or walk about six hours in an eight-hour work day.  He could only occasionally balance, and he should avoid even moderate exposure to hazards such as machinery and heights.  R. 135-42.

In an examination at the Volusia County Health Department in July 2003, Johns indicated that he had had a seizure sometime since his last examination.  R. 211.  He

---

[2]  Medical records reflect that normal levels for Dilantin as measured by blood tests are 10-20 ug/ml. R. 185.  Normal levels for Tegretol as 4-12 ug/ml.  *Id.*

NOT FOR PUBLICATION

reported during an examination in August 2003 that he had had a seizure three days earlier.  R. 208.

Brad Warrick, M.D., examined Johns in September 2003.  Dr. Warrick observed that Johns had a flat affect, but he was able to follow simple directions.  He opined that Johns was severely depressed and that his complaints of memory loss were secondary to depression and likely sleep apnea.  R. 154.

Steven K. Abraham, Psy.D., and David M. Zelbovitz, Psy.D., examined Johns on September 3, 2003, at the request of the SSA.  At that time, Johns reported that he had two to three seizures every month.  He had memory problems, was depressed and had difficulty concentrating.  He was taking a variety of medications.  R. 148.  He scored poorly on a mental status test.  R. 149-50.  The diagnoses were as follows:  major depression, recurrent, moderate severity; and cognitive disorder not otherwise specified.  The psychologists rated Johns' global assessment of functioning (GAF) score at 50.[3]  They opined that "the physical and psychological challenges faced by [Johns] are significant enough to make withstanding the pressures of a work environment quite difficult."  R. 150.

In September 2003, David Z. Kitay, M.D., prepared a physical RFC assessment after reviewing Johns' records.  Dr. Kitay's exertional capacity assessment was the same as Dr. Ravipati's assessment.  R. 156-63.  With respect to nonexertional limitations, Dr. Kitay

---

[3]  The Global Assessment of Functioning ("GAF") scale ranges from 100 (superior  functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for himself).  *Harold I. Kaplan, M.D. & Benjamin J. Sadock, M.D., Synopsis of Psychiatry* 299 (8th ed. 1998) (hereinafter *Synopsis of Psychiatry*). A GAF rating of 41-50 reflects "Serious symptoms (eg, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (eg, no friends, unable to keep a job). *Id.*

NOT FOR PUBLICATION

opined that Johns should never climb ladders, ropes or scaffolds,and that he could only occasionally balance.  R. 158.  He found no other nonexertional limitations.

Also In September 2003, Deborah Carter, Ph.D., prepared mental RFC assessments after review of Johns' records.  R. 164-81.  Dr. Carter opined that Johns would have moderate limitations in activities of daily living and in maintaining concentration, persistence or pace, and only mild limitations in social functioning, with no episodes of decompensation.  R. 178.  She indicated that Johns would be moderately limited in the following abilities:  to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and travel in unfamiliar places or use public transportation.  R. 164-65.

On January 3, 2004, Johns indicated during an examination at the Volusia Health Clinic that he had had seven seizures of the grand mal type since his previous visit.  Blood tests showed that his medication was on the lower side of the therapeutic range.  His medication was adjusted.  R. 205.

Alyn Benezette, D.O., a neurologist, examined Johns on February 23, 2004.  Johns indicated that he was having two seizures a month even though he was taking his medication as prescribed.  He indicated that he had no warning of an oncoming seizure. During a seizure, he lost consciousness with muscle spasms (tonoclonic activity) in his extremities, bit his tongue and experienced bowel and bladder incontinence.  He also had

problems with concentration, attention, memory and balance. He complained of headaches, episodic blurred vision, shortness of breath and chest pain. He was no longer driving. R. 265-66.

Upon examination, Dr. Benezette noted that Johns' thought processes were slow and he was somewhat incoherent at time. R. 267. There was clubbing of his fingers, his reflexes were diminished and he walked with a wide-based gait indicative of balance problems. His impression was that Johns suffered from generalized tonoclonic epilepsy secondary with disequilibrium and encephalopathy. Dr. Benezette instructed Johns to continue his medication and not to operate a motor vehicle. R. 267.

Dr. Benezette examined Johns again in March 2004. He reported having three seizures that month. R. 261. In April, Johns told Dr. Benezette he had had two seizures that month. Dr. Benezette prescribed a trial of the medication Keppra. R. 259. He wrote that Johns "remains unable to work with a poor prognosis of ever returning to any type of gainful employment." R. 260; *accord* R. 258.

Thereafter, Johns continued treatment with Dr. Corak. On May 13, 2004, he reported that since his last examination one year before he had three seizures, all in the previous month. Dr. Corak increased the doseage of Dilantin and Tegretol. R. 270. When Dr. Corak next saw Johns in November 2004, Johns indicated that he was having infrequent seizures but that he had three grand mal episodes each month. He had not taken the increased the dosage of Tegretol as previously prescribed. R. 269.

Dr. Benezette prepared physical and dizziness RFC questionnaires in November 2004. He opined that Johns suffered from generalized tonoclonic epilepsy with moderate

NOT FOR PUBLICATION

short term memory loss.  He also had diminished vision, an injured left shoulder that dislocates, a low back condition and he was depressed.  His prognosis was poor.  He indicated that Johns was not a malingerer.  He opined that Johns would be incapable of work at even low stress jobs.  He could sit one hour and stand forty-five minutes at a time, with a total of four hours of sitting and four hours standing and walking in an eight-hour day. He would need to walk around and shift positions and take breaks and lie down as needed. He could occasionally lift up to twenty pounds.  He could only occasionally twist, stoop (bend) and crouch/squat, never climb ladders, rarely climb stairs and never work at heights. He would likely be absent from work more than four days a month.  R. 250-253A, 255.  He would suffer dizziness three or more times a month, each episode lasting one minute with recovery taking up to several hours.  The episodes were also associated with nausea/vomiting, visual disturbances, photosensitivity, sensitivity to noise, mental confusion/inability to concentrate, fatigue/exhaustion, falling, biting of the tongue, and bowel and bladder incontinence.  R. 254-57.

On May 19, 2005, Dr. Corak examined Johns.  Johns reported having two to three seizures each month.  He had increased his doseage of Tegretol and directed and he continued to take Dilantin.  Dr. Corak prescribed Depakote in addition to the other medications.  R. 548.  On the same day as this examination, Dr. Corak completed a physical RFC questionnaire.  He wrote that Johns had two to three seizures per month accompanied by loss of consciousness, with the most recent seizure being in November 2004.  A typical seizure lasted three to four minutes, followed by confusion, exhaustion, irritability and a severe headache which lasted one to two hours.  Dr. Corak stated that

Not for Publication

Johns was compliant with his medication.  In response to the functional capacity questions, Dr. Corak wrote that Johns was unable to work.  R. 303-304A.

In July 2005, Johns told Dr. Corak that he had had a seizure two days earlier.  He had only begun taking Depakote one day before the examination.  R. 547.

Dr. Corak examined Johns again on January 12, 2006.  Johns indicated that Depakote had caused side effects so he stopped taking it.  Dr. Corak substituted the medication Topamax.  R. 546.  On April 13, 2006, Johns told Dr. Corak that Topamax was not making a difference in his condition.  Dr. Corak increased the doseage.  R. 545.

In July 2006, Dr. Corak pressed Johns about the frequency of his seizures in an effort to determine why they were more frequent that they had been during the early years of his treatment.  Johns stated, "'I was having seizures all along but it didn't seem like no big deal.'"  R. 544.[4]  During this examination, Dr. Corak observed Johns suffer what appeared to be a complex partial seizure.  He wrote, "[Johns] initially appeared intoxicated when I entered, slow in speech and thought.  He then stopped responding and just stared. He started to slide over the chair.  This was all after about 30 seconds and his mental status was much better than when I had first entered, back to his usual self."  *Id.*

Dr. Corak examined Johns again in October 2006.  Johns reported having occasional seizures.  Dr. Corak wrote that Johns was taking less than the prescribed dosage of Keppra and that he was "not very compliant."  R. 543.

---

[4]  At the most recent hearing, Johns testified that he did not make this statement to Dr. Corak. Rather, he averred that he told Dr. Corak about his seizures but he believed, from Dr. Corak's attitude, that Dr. Corak did not believe that his seizures were a "big deal." R. 743-44.

In 2007, P. Travis Smith, M.D., began treating Johns for severe chronic obstructive pulmonary disease (COPD).  He responded well to medication and use of an inhaler.  R. 535-36.

On November 25, 2008, Alvin Barber, M.D., examined Johns at the request of the SSA.  Johns reported that he was then having a couple of mild seizures a week during which he faded in and out.  He reported having grand mal seizures four to six times a year, most recently on November 23, 2008.  He complained of memory problems, headaches and being disoriented.  R. 504.  Upon examination, Dr. Barber noted a positive memory deficit and slow processing of information with depression.  R. 508.  In a medical source statement, Dr. Barber indicated that Johns could never work at unprotected heights, around moving mechanical parts, or operate a motor vehicle, among other things.  R. 520.

Beginning in August 2008, Stephanie L. Carinci, M.D., who took over Dr. Corak's practice, began treating Johns.  *See* R. 734.  Johns reported that he had not had a seizure since May.  R. 542.  During an examination in February 2009, Johns estimated that he had two breakthrough seizures a month.  R. 540.  In July 2009, Mrs. Johns accompanied him for his appointment with Dr. Carinci.  She indicated that Johns had periodic complex partial seizures and one generalized tonoclonic event each month, mostly when sleeping.  He was tolerating his medication, but he felt a bit drugged.  Dr. Carinci continued Johns on his medication.  R. 681.

At the hearing on remand, the ALJ called upon Bruce G. Whitkind, M.D., a board certified neurosurgeon, and Edward A. Griffin, M.D., a board certified internist, to testify after review of Johns' records.

NOT FOR PUBLICATION

Dr. Whitkind noted that Johns appeared to have been compliant with his medication throughout "quite a bit" of the record with adequate Dilantin, Keppra and Tegretol levels. Lab reports, especially in exhibit 23F, showed Johns normally had adequate levels of anti-seizure medication. R. 691; *see also* R. 706. He also opined that patients were pretty good historians about their petit mal seizures. R. 702.

Dr. Whitkind noted that during the early years of treatment by Dr. Corak, there were many inconsistencies. He attested that the more valid and reasonable documentation began in 2006. R. 696.

He opined that neither Dr. Benezette's RFC assessment in 2004 nor Dr. Corak's RFC assessment in 2005 were supported by the medical records. R. 698, 707-08. However, Dr. Whitkind believed Johns would meet Listing 11.03 on or about November 25, 2008, at the time of Dr. Barber's examination, because he was neurologically unstable at that time. R. 698, 700. He based this on Dr. Barber's observations that Johns was not able to tandem walk or had diminished coordination, his gait was slow and he had memory deficits. R. 700-01. Dr. Whitkind stated that Johns was not capable of employment as of November 25, 2008. R. 701.

Dr. Griffin testified that Johns' seizures were well controlled until late 2002. In December of 2002, he began having two types of seizures. He testified that Johns' Dilantin levels were within the reference range for the most part, but his Tegretol levels were sub-reference or sub-therapeutic. When the dosage of Tegretol was increased, Johns did not have seizures for six weeks. However, Dr. Griffin observed that, in 2004, Johns was having seizures even through his medication was at therapeutic levels. R. 710. Dr. Griffin

NOT FOR PUBLICATION

also stated that the possibility of Johns having sleep apnea and his COPD might have triggered seizures and aggravated daytime seizure control.  R. 711.   Additionally, he observed that smoking could affect seizure control because tobacco accelerates Dilantin metabolism, which would lower Johns' Dilantin level to a non-therapeutic range.  R. 730.

Dr. Griffin testified that Dr. Corak's RFC assessment could not be credited because it was based on inadequate information due to Johns' failure to tell the doctor about his seizure activity.  R. 722.  He opined that Johns' doctors would have made significant adjustments in his medications if they knew he had been having seizures.  R. 711.  He discredited Dr. Benezette's RFC assessment, noting that he appeared to accept Johns' subjective reports without testing and that the opinion was not supported by his records.  R. 714, 716.

Dr. Griffin testified that Johns did not meet any of the listings.  R. 729.  Dr. Griffin agreed with Dr. Barber's stand/walk assessment that Johns could stand and walk for thirty minutes consecutively four out of eight hours.  He could sit for six out of eight hours.  He could frequently bend, stoop, squat, crouch, crawl and kneel.  He could reach with his left hand.  He could frequently operate foot and pedal controls.  R. 727.  He should not climb ropes, ladders or scaffolds.  Johns could shop and travel without a companion.  R. 728.  He should not work around unprotected heights or moving machinery, should not operate a motor vehicle, and should not work around extreme temperatures.  R. 728-29.  His work environment should be clean but not sterile due to his COPD.  R. 729.

Finally, the ALJ asked a VE to testify at the hearing on remand.  The ALJ posed the following hypothetical question to the VE:

NOT FOR PUBLICATION

[T]his gentleman who has documentation, which is supportive of a seizure disorder.  In the course of an eight-hour workday -- I would conclude that such an individual in the course of a normal workday could sit, stand, and walk for at least six hours or more in an eight-hour workday.  They have the ability to lift occasionally at least 20 pounds up to 1/3 of the workday and more frequently 10 pounds or less.  Would such an individual . . . have the ability to push/pull objects within that same weight limitation as well as grasp, hold, finger, turn, and manipulate objects within those same weight limitations in terms of their ability, and there's no deficits in terms of reaching either overhead, in front, or laterally.  They would still be confined to the weight limits I offered you . . . [H]e can climb stairs and ramps occasionally, do no climbing of ropes, ladders, and scaffolds, can occasionally balance, stoop, kneel, crouch, and crawl.  He has environmental limitations which preclude him from working at unprotected heights, around dangerous moving machinery, operating a motor vehicle, working in a non-temperature controlled environment.  In other words, he shouldn't be working around extreme heat or extreme cold, and I would also note that because of his respiratory difficulties he shouldn't be working in proximity to concentrated amounts of atmospheric pollutants such as dust, smoke, fumes, chemicals, and the like. . . . little documentation to suggest any kind of mental impairment or dysfunction.  Although he's complained about inability to concentrate there's really nothing in the record to support any kind of mental deficits but . . . based on his vocational profile you can go ahead in an abundance of caution and confine him to the performance of simple one and two-step type jobs that are tantamount to unskilled work, which don't involve any significant judgment.  Having already previously concluded that he can't do his past work would there be other unskilled light jobs that this gentleman could perform within the parameters of that hypothetical?

R. 765-66.  The VE opined that this hypothetical claimant could perform the jobs of assembler of small products I, assembler of small products II, and assembler of electrical accessories I, all of which are light work and unskilled.  R. 767-68.

NOT FOR PUBLICATION

The ALJ asked the VE if such a person had petit mal seizures as many as two times a month and needed fifteen to thirty minutes before he could resume work, whether that would impact the jobs listed.  R. 768.  The VE responded that such a condition would be a moderate impairment and would be reasonably accommodated unless it occurred on a regular basis.  R. 768-69.  The VE testified that this condition would not be expected to impact the jobs listed.  R. 769.

The VE testified that if Johns were limited to no sorting, handling or using paper, as indicated by Dr. Barber, none of the jobs above could be performed.  R. 770.  Dr. Benezette's finding that Johns was incapable of even low-stress jobs would rule out even simple unskilled work.  R. 771.  An impairment of frequent problems with attention and concentration, as stated by Dr. Benezette, would also preclude the ability to perform the jobs identified by the VE.  R. 772.

## V.    ANALYSIS.

Johns asserts that the ALJ erred by failing to accord great weight to the opinions of Dr. Benezette and Dr. Corak as required by this Court's remand order.  He also argues that the ALJ deprived him of due process because he did not consider the record as a whole and he did not permit his attorney to ask certain questions on cross-examination.  These are the only issues I will address.[5]

In this circuit, the opinion of a treating physician must be "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*,

---

[5]  The parties were advised in the Scheduling Order that issues not specifically raised would be considered to have been waived.  Doc. No. 14 at 2.

125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2)). Good cause has been found "where the doctor[s'] opinion[s] [were] not bolstered by the evidence, . . . where the evidence supported a contrary finding[,] . . . [or] where the doctors' opinions were conclusory or inconsistent with their own medical records." *Id.* (internal citations omitted). While an ALJ may disregard a treating physician's opinion that a claimant is disabled or unable to work, *see* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1), the ALJ must articulate reasons for giving less weight to the functional capacity assessments of a treating physician. *Lewis*, 125 F.3d at 1440.

Johns contends that the ALJ did not follow this law and the Court's remand order because he did not give great weight to the RFC assessments by treating physicians Corak and Benezette. Neither the law nor this Court's remand order required the ALJ to give great weight to these opinions if the ALJ found good cause not to do so. The question presented, therefore, is whether there is substantial evidence in the record to support the ALJ's conclusion that good cause existed not to credit either Dr. Corak or Dr. Benezette's RFC assessments.

The ALJ rejected Dr. Benezette's RFC assessment based on Dr. Whitkind's testimony that the medical records did not support the limitations and Dr. Griffin's testimony that Dr. Benezette's assessment appeared to be based on subjective reports by Johns rather than by objective testing. R. 405. These reasons provide good cause not to credit Dr. Benezette's RFC assessment provided they are supported by substantial evidence in the record.

Dr. Benezette is a neurologist who began treating Johns in February 2004 for a seizure disorder.  He credited Johns' reports of the number of seizures he experienced and the associated symptoms.  He observed that Johns' thought processes were slow and somewhat incoherent at time, his reflexes were diminished and he walked with a wide-based gait indicative of balance problems.  He did not, however, provide any basis for his conclusion that stress would somehow aggravate Johns' condition.  His opinion regarding limitations on standing, sitting, and shifting positions appear to be based on his conclusion that Johns had a low back condition, rather than limitations arising from a seizure disorder.  Dr. Benezette's records do not contain objective findings of a low back condition supporting the RFC assessment, and Dr. Benezette did not treat Johns for such a condition.  Because substantial evidence supports Dr. Whitkind's opinion that Dr. Benezette's RFC assessment was not supported by his medical records or the record as a whole, the ALJ did not err by rejecting Dr. Benezette's RFC assessment.

As to Dr. Corak's RFC assessment, the ALJ determined that it was not entitled to substantial weight because it was not well-supported by medically acceptable clinical and laboratory diagnostic techniques, it was internally inconsistent as indicated by Dr. Griffin, and it was inconsistent with the record as a whole.  The ALJ found, also, that Dr. Corak's opinion was based on inaccurate information due to Johns' failure accurately to report the extent of his seizure activity.  These reasons state good cause for not crediting Dr. Corak's RFC assessment if the reasons are supported by substantial evidence in the record.

Dr. Corak treated Johns for more than twenty years.  From 1996 through 2003, Johns reported that he was essentially seizure free except for about six months in late

NOT FOR PUBLICATION

2002.  In 2004, Johns began reporting seizure activity despite increases in medication.  Dr.

Corak observed that Johns was not taking medication as prescribed, R. 269, yet he wrote

in the RFC assessment that Johns was compliant with his medication, R. 304.  Dr. Corak

did not state the functional limitations due to the seizure disorder.  Rather, he simply

indicated that Johns was unable to work.  R. 304A.  This summary conclusion offered little

substantive basis for the ALJ to determine whether the RFC assessment was adequately

supported by the record.  Finally, the ALJ credited the opinions of both Dr. Whitkind and Dr.

Griffin that the medical evidence as a whole as of May 2005, when Dr. Corak provided his

RFC assessment, did not support a finding that Johns could not work.[6]

Because the ALJ articulated specific reasons for not crediting Dr. Corak's RFC

assessment, and those reasons are supported by substantial evidence, the ALJ did not err

by failing to accept Dr. Corak's RFC assessment.

Turning next to the due process argument, Johns contends that the ALJ overlooked

or ignored substantial evidence and failed to allow his attorney to ask relevant questions.

The first contention is unavailing.  The ALJ's questions during the hearing on remand and

his written decision establish that he thoroughly reviewed and considered all of the

evidence in the record.

---

[6]  Johns argues that Dr. Corak's RFC assessment is supported by Dr. Corak's notes, which indicate
he observed Johns having a seizure.  This occurred in July 2006, well after Dr. Corak provided his RFC
assessment in May 2005.  This later evidence does not provide support for the earlier assessment.
Similarly, Dr. Whitkind's opinion that Johns' condition may have met or equaled a Listing as of 2008, and Dr.
Barber's RFC assessment rendered in 2008 do not apply retroactively to support Dr. Corak's 2005 RFC
assessment.  Johns did not state as an issue on appeal that the ALJ erred by failing to credit Dr. Whitkind's
and Dr. Barber's opinions.  *See* Doc. No. 20 at 1 ("STATEMENT OF THE ISSUES:  Whether . . . substantial
evidence supports the ALJ when he failed on remand to accord great weight as instructed to the medical
opinions of Dr. Corak and Dr. Benezette?").

The ALJ allowed Johns' counsel to ask questions of the witnesses.  He did not permit the attorney to ask Dr. Whitkind whether it was important to see a patient before rendering a medical opinion because Dr. Whitkind had been called to render a decision only based on the medical records.  *See* R. 707-08.  He did not permit the attorney to pose some questions to the VE because he found them insufficiently specific or otherwise resolved by law or regulations.  *See, e.g.,* R. 769-72.  Johns has not shown how the answers to those questions would have changed the disability decision.  He also has not cited any legal authority to support his contention that the ALJ's rulings as to certain questions were so restrictive as to deprive him of due process.  Therefore, this assignment of error is also unavailing.

NOT FOR PUBLICATION

## VI.    RECOMMENDATION.

For the reasons set forth herein, I respectfully recommend that the decision of the Commissioner be **AFFIRMED**.  I further recommend that the Court direct the Clerk of Court to issue a judgment consistent with its ruling and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**RESPECTFULLY RECOMMENDED** this 12th day of August, 2011.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge
Counsel of Record